STATE OF CONNECTICUT *v.* DAVID BURROUGHS
(AC 26095)

Bishop, DiPentima and Hennessy, Js.

Argued September 27, 2006—officially released February 6, 2007

*Robert S. Bello*, with whom, on the brief, were *Lawrence M. Lapine, Thomas M. Cassone* and *Patrick D. McCabe*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Kelley P. Swift*, former assistant state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, David Burroughs, appeals from the judgment of conviction rendered following his conditional plea of nolo contendere[1] to possession of narcotics with the intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b) and possession of narcotics in violation of General Statutes § 21a-279 (c).[2] The plea followed the court's denying the defendant's motion to suppress all items seized from him and his vehicle. The defendant received a sentence of six years followed by six years of special parole. On appeal, the defendant claims that the court improperly denied his motion to suppress because the police subjected him to an illegal "stop" that constituted a seizure under the fourth amendment to the United States constitution[3] and arti-

___

[1] General Statutes § 54-94a provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress . . . would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ." See also Practice Book § 61-6 (a) (2) (i).

[2] The defendant was also convicted of failure to appear in the first degree in the first case and with forgery in the second degree in the second case. The defendant's conditional plea of nolo contendere was limited to the narcotics charges in the first case, and he has raised no claim that relates to the conviction of failure to appear in the first degree. We therefore affirm the judgment with respect to that crime. The defendant also listed the docket number of his forgery conviction on his appeal form and on the docketing statement. He has not raised any claim that relates to that conviction, and we therefore affirm that judgment as well.

[3] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

cle first, §§ 7 and 9, of the constitution of Connecticut. We agree with the defendant and therefore reverse the judgment of the trial court.

In ruling on the defendant's motion, the court found the following facts. On the night of May 21, 2003, Joseph Duguay, a uniformed member of the Stamford police department since June, 1977, and his partner, Stamford police Officer Robert Macari, were on patrol in a marked police vehicle. At approximately 10:30 p.m., the officers received a radio transmission from the police department dispatcher directing them to investigate a suspicious car in the area of 70 Dyke Lane. The vehicle was described as a possible black BMW with license plate 685 PXD.

The officers drove to Dyke Lane and observed a black vehicle parked facing north in front of 70 Dyke Lane with two occupants: a male, later identified as the defendant, in the driver's seat, and a female, later identified as the defendant's cousin, in the front passenger seat. As the officers drove by the defendant's car, the officers did not observe any criminal or suspicious activity on the part of the occupants of the vehicle. Dyke Lane in this area is primarily an industrial commercial area. The defendant's car, however, was parked in front of a private residence.

The officers drove by the car and turned their vehicle around to bring it to the rear of the parked car. The parked car was a black Pontiac Grand Am, not a black BMW, and the license plate was 695 PXD, not 685 PXD. At all times while operating their police vehicle on Dyke Lane, the officers activated only the ordinary headlights on their vehicle. At no time did the officers activate

warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

their vehicle's siren or the overhead, side strobe lights or flashing colored lights.

After parking behind the Grand Am, the officers exited their vehicle and approached the Grand Am. Duguay approached on the driver's side, and Macari approached on the passenger side. Neither officer drew his handgun; the guns remained in the respective holsters. The driver's side window had been lowered three to four inches. When Duguay approached the car window, he smelled marijuana and then noticed marijuana residue on the driver's jacket. Duguay testified that he had received training with regard to marijuana and that during his police service he had encountered and smelled marijuana "tens, if not hundreds of times."

At this time, Duguay asked the defendant to exit the car and directed him to place his hands on the front hood of the car. Then, Duguay conducted an external patdown for weapons. Duguay found no weapon.

Meanwhile, another police vehicle arrived on Dyke Lane. Duguay asked the defendant to walk back to the rear of the patrol car, where two officers were now standing by. As the defendant walked toward the police car, he reached into his jacket and pulled out a bag of what was later determined to be marijuana, handed it to Officer Thomas Pjatuk, one of the officers who had recently arrived on the scene, and then ran off. Duguay and Pjatuk pursued the defendant on foot and eventually apprehended him. The defendant was arrested, handcuffed and brought back to the area of 70 Dyke Lane, where he was placed in the rear of a patrol car.

Officer Yan Vanderven, who had been a member of the Stamford police department for about eight years when he testified, arrived at the Dyke Lane location with his partner, Officer Romano Malacone, in response to a police radio call about a foot pursuit in the area.

As they arrived, Duguay and Pjatuk, together with their partners, returned with the defendant in custody.

Once the defendant was in custody, Vanderven searched the Grand Am. When he opened the driver's door, he observed pieces of marijuana on the driver's seat. He also saw a plastic bag in a "cubbyhole," located in the dashboard to the left and a little below the steering wheel. He retrieved the bag and found that it contained a number of packages of what appeared to be crack cocaine, a narcotic that he testified he had encountered more than 100 times during his training and experience on the police force. In the trunk of the vehicle, he found a blue gym bag inside of which there was a plastic bag containing a number of smaller bags. All these items were secured and turned over to one of the officers at the scene.

The defendant was arrested and charged with possession of narcotics with the intent to sell and possession of narcotics. On November 24, 2004, the defendant filed a motion to suppress the narcotics. Following an evidentiary hearing on December 7, 2004, the court denied the defendant's motion. The court stated in its memorandum of decision and articulation that "[u]nder such circumstances, the police officers' going to question the occupants of the car alone, without the use of physical force or the demonstration of authority shown by overhead flashing lights, even if the officers had no articulable suspicion of criminal activity, did not constitute a seizure or illegal activity." The court also commented that once "Officer Duguay smelled the odor of marijuana emanating from the car's interior and, as he peered into the window, noted marijuana residue on the driver's jacket," the circumstances changed, i.e., probable cause existed to search the vehicle. According to the court, the officers, "[h]aving probable cause to search the vehicle . . . then had a right to detain the defendant and to ask him to exit the car so the search

might be effected. . . . The subsequent search of the vehicle . . . and the discovery of the packages of crack cocaine and packaging papers was constitutional." (Citations omitted.) The court found that the defendant was not seized until the officers smelled the marijuana, at which time, the officers had probable cause to search the vehicle. The court therefore denied the defendant's motion to suppress the evidence. Subsequently, the defendant withdrew his not guilty plea and entered a conditional plea of nolo contendere. The court imposed a sentence of six years in prison and six years of special parole. The defendant thereafter filed this appeal.

As an initial matter, we note that our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 92, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). The defendant challenges not the trial court's factual findings, but rather its legal conclusions that the actions of the police were constitutionally valid. These conclusions are subject to plenary review. See *State* v. *Hammond*, 257 Conn. 610, 616, 778 A.2d 108 (2001).

The issue on appeal requires the difficult task of balancing the interest of our citizens in being free from search and seizure against the need for law enforcement officers to investigate criminal conduct and protect the public's safety. "Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights . . . we engage in

a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

On appeal, the defendant contends that the court improperly denied his motion to suppress. He claims that the police did not have reasonable and articulable suspicion that criminal activity had occurred or was about to occur so as to justify his initial detention. We agree with the defendant.

"When considering the validity of a . . . stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d 981 (2004).

I

Initially, we must determine at what point, if any, the encounter between the officers and the defendant constituted an investigatory stop or a seizure. The parties do not agree as to when precisely the stop began. The state claims that the defendant was free to leave until the officers smelled the marijuana and saw the residue on the defendant's jacket. The defendant contends that the stop began as soon as the marked police

car parked behind his car and the two uniformed officers approached, one on either side of his car. We agree with the defendant and conclude that the seizure occurred at the time that the officers left their marked patrol car and began their approach of the defendant's vehicle because a reasonable person would not have felt free to leave in that situation.

Under our state constitution, "[a] person [is defined] as seized . . . when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining whether a seizure has occurred, so as to invoke the protections of our state constitution . . . a court is to consider whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Internal quotation marks omitted.) *State* v. *Donahue*, 251 Conn. 636, 642–43, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000); see also *United States* v. *Mendenhall*, 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).

Furthermore, "[t]he trial court's determination [of whether a seizure occurred] will not be overturned unless it was clearly erroneous. . . . When a factual issue implicates a constitutional claim, however, we review the record carefully to ensure that its determination was supported by substantial evidence." (Citation omitted.) *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993). After a thorough review of the record, we conclude that the court's legal conclusion that the approach by the police did not constitute an investigatory stop so as to implicate the fourth amendment to the federal constitution and article first, §§ 7 and 9, of the constitution of Connecticut was improper.

The following facts, found by the court, are relevant to our conclusion that the defendant was detained by the police for purposes of investigation. It was 10:30 at

night, and the defendant's car was legally parked on the street. The police were driving a marked patrol car. The police drove past the defendant's parked vehicle in a marked patrol car. Then, they turned the patrol vehicle around and parked behind the defendant's car. As the officers exited their vehicle, they left their headlights illuminated. The officers were wearing full police uniforms, including their guns. One officer approached the defendant's car on the driver's side, while the other officer approached on the passenger side of the vehicle. In view of all these circumstances, we are persuaded that a reasonable person in the defendant's position would not have believed that he was free to step out of the car and walk away or was free to drive off. Accordingly, we conclude that the police subjected the defendant to a stop that constituted a seizure under both the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the Connecticut constitution.

II

Having determined that a seizure of the defendant took place, we must next determine whether the seizure was based on a reasonable and articulable basis of suspicion.[4] We conclude that the officers did not possess, at the time the seizure occurred, a reasonable and articulable suspicion sufficient to justify a detention of the defendant for investigative purposes. Thus, the court's determination was improper.

The federal law of search and seizure in this area is well settled. The fourth amendment to the federal

---

[4] We note that the state concedes in its brief that if the defendant had been seized as the police officers were walking to his vehicle, such a seizure would have violated article first, §§ 7 and 9, of our state constitution because the police did not have reasonable and articulable suspicion for a legal seizure at that time. We nonetheless address whether the seizure was based on a reasonable and articulable suspicion because we are not bound by the state's concession. See *State* v. *Vasquez*, 66 Conn. App. 118, 126 n.8, 783 A.2d 1183, cert. denied, 258 Conn. 941, 786 A.2d 428 (2001).

constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Precedent reveals that "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Florida* v. *Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *Terry* v. *Ohio*, 392 U.S. 1, 24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Our Supreme Court has determined that our state constitution affords greater protection against illegal searches and seizures than does the federal constitution. *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992). "Article first, §§ 7 and 9 of our state constitution permit a police officer in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes even though there is no probable cause to make an arrest. . . . In determining whether the detention was justified in a given case, a court must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . These standards, which mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio*, [supra, 392 U.S. 20–22], with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9 of our state constitution." (Citations omitted; internal quotation marks omitted.) *State* v. *Donahue*, supra, 251 Conn. 643–44.

The facts of this case are similar to the facts of *State v. Donahue*, supra, 251 Conn. 647–48, in which the defendant was driving in a deserted, high crime area late at night and made an abrupt turn into an empty parking lot of an establishment that was closed. Although the behavior of the defendant in *Donahue* was consistent with behavior that often precedes criminal activity, the defendant was not driving erratically and had not violated motor vehicle laws. Furthermore, the vehicle had not been stolen, nor was it the subject of a police investigation. The court in *Donohue* held that such behavior alone, without more, cannot form the basis for reasonable and articulable suspicion justifying the seizure, no matter how brief, of a person. See also *State v. Santos*, supra, 267 Conn. 509 ("presence in a high crime area at night, without any other facts, cannot form the basis for a reasonable and articulable suspicion that the defendant had engaged or was about to engage in criminal activity").

In the present case, when the police approached the defendant, they did not possess sufficient information to give rise to a particularized and objective basis for suspecting him of criminal activity. As the court found, the police had received an anonymous tip that specifically indicated that there was a suspicious vehicle on Dyke Lane, which was black in color with a license tag of 685 PXD. Although an anonymous tip alone is insufficient to justify an investigatory stop, it may contribute, in combination with other evidence, to a reasonable suspicion for such a stop. "In the context of an anonymous tip . . . a totality of the circumstances test is used, requiring independent police investigation to corroborate details because [u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated . . . an anonymous tip alone seldom demonstrates the informant's basis of knowledge or

veracity . . . . As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." (Citations omitted; internal quotation marks omitted.) *State* v. *Hammond*, supra, 257 Conn. 617, quoting *Florida* v. *J. L.*, 529 U.S. 266, 270, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000).

Here, there were no criminal allegations contained in the anonymous tip, and the anonymous tip provided no predictive information.[5] The anonymous caller described the black vehicle as suspicious. The police officers were dispatched to Dyke Lane to investigate a suspicious vehicle. When the officers arrived on Dyke Lane, they noticed a car fitting the description received through dispatch; however, they witnessed no suspicious or criminal activity that would warrant further investigation. The car was legally parked in front of a residence. There were two people in the car, a man and a woman. The officers did not witness anything suspicious or criminal as they drove by the car.

Although the anonymous tip was reliable in that the car was black and had a similar license tag, there was no allegation of criminal activity and no criminal activity was witnessed. Also, there was no conduct articulated by the police that, although legal, would be considered

---

[5] Predicting future conduct of an alleged criminal is one way by which the police can test an anonymous informant's knowledge and credibility. There may be other features that provide the lawful basis for some police action. "For example, if an unnamed caller with a voice which sounds the same each time tells the police on two successive nights about criminal activity which in fact occurs each night, a similar call on the third night ought not to be treated automatically like the tip in the case before us [that the court determined lacked the requisite indicia of reliability]. In the instance supposed, there would be plausible argument that experience cures some of the uncertainty surrounding the anonymity, justifying a proportionate police response." *Florida* v. *J. L.*, supra, 529 U.S. 275 (Kennedy, J., concurring).

"suspicious."[6] Thus, through their investigation, the officers were not able to develop evidence that corroborated the anonymous tip and gave rise to a reasonable and articulable suspicion that the defendant was involved in criminal activity. We conclude that a seizure occurred prior to the police having sufficient objective indicia of criminal activity to justify an intrusion on the defendant's freedom of movement. The initial detention was, therefore, illegal.

## III

The only issue that remains is whether our conclusion compels the determination that the evidence should have been suppressed as a consequence of that illegality. We conclude that the evidence should have been suppressed.

Under the exclusionary rule, evidence must be suppressed if it is found to be the " 'fruit' " of prior police illegality. *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). All evidence is not, however, a " 'fruit of the poisonous tree' " simply because it would not have been discovered but for the illegal action of law enforcement officials. Id., 487–88; see *State* v. *Villafane*, 171 Conn. 644, 655, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part on other grounds by *State* v. *Stepney*, 191 Conn. 233, 254, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objec-

---

[6] The issue "is not whether the particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." (Internal quotation marks omitted.) *United States* v. *Sokolow*, 490 U.S. 1, 10, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).

tion is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun* v. *United States*, supra, 488, quoting J. Maguire, Evidence of Guilt (1959) p. 221. The initial determination is, therefore, whether "the challenged evidence is in some sense the product of illegal government activity." *United States* v. *Crews*, 445 U.S. 463, 471, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980); see also *State* v. *Miller*, 29 Conn. App. 207, 216, 614 A.2d 1229 (1992) ("[b]ecause the seizure of the gun did not owe its origin in material part to the [illegal] *Terry* stop, the *Terry* stop cannot provide a basis for excluding the gun from evidence"), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993).

The state argues that this case is similar to *State* v. *Colvin*, 241 Conn. 650, 697 A.2d 1122 (1997), in which the exclusionary rule did not require the suppression of the narcotics and paraphernalia that the police subsequently discovered, and which formed the basis of the conviction, because they did not constitute the tainted fruit of that illegal seizure. Id., 656. A brief rendition of the facts underlying the decision of our Supreme Court in *Colvin* is necessary to our discussion. In *Colvin*, several officers observed the defendant drive to 235 Sergeant Street in Hartford, park his car and walk 200 feet away to 91 Atwood Street where he sat on a stoop. The officers observed the defendant for about half an hour and witnessed no illegal behavior. Regardless, the officers subsequently approached the defendant while he was on the stoop and ordered him to accompany them to his vehicle, which he did. Id., 653. One of the officers, from the sidewalk, looked into the vehicle and saw in plain view a bag containing what appeared to be, and was later determined to be, narcotics. At this point, the officers seized the bag and charged the defendant with possession of narcotics. Id., 653–54. Our Supreme Court held that the police had a perfect right

to be where they were and to observe the cocaine in plain view and that suppression of the narcotics was not warranted because it was not seized as a consequence of police misconduct. Id., 660–61.

The facts in the present case are distinguishable from the facts in *Colvin*. Here, the illegal seizure occurred when the marked police car was parked behind the defendant's car and the officers in full uniform approached the defendant's car, one officer on either side. The defendant in *Colvin*, on the other hand, was not seized at his car, but rather on the sidewalk, away from the car. The police then took him to his car, at which time one of the officers saw the drugs through the window of the vehicle in plain view. Id., 653–54.

In this case, it is impossible to separate the illegal seizure from the evidence collected by the police at the scene of the illegal seizure. The police officers' presence at the defendant's vehicle under these circumstances was not legal. Once we conclude that the police had no reasonable suspicion to approach the defendant's vehicle under the circumstances in this case, we then must conclude that any evidence obtained while the police were at the vehicle stop must be suppressed. Consequently, the evidence recovered as a direct consequence of that unlawful stop should have been suppressed.

The judgment in the first case is reversed only with respect to the charges of possession of narcotics with the intent to sell by a person who is not drug-dependent and possession of narcotics and the case is remanded with direction to grant the defendant's motion to suppress and for further proceedings according to law; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.